842 F.2d 333
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James Ronald O'LEARY, Defendant-Appellant.
 No. 87-5472.
 United States Court of Appeals, Sixth Circuit.
 March 28, 1988.
 
 Before NATHANIEL R. JONES, WELLFORD and BOGGS, Circuit Judges.
 PER CURIAM:
 
 
 1
 Defendant James Ronald O'Leary appeals the district court's denial of his motions for a new trial under Federal Rule of Criminal Procedure 33, and for an evidentiary hearing. After reviewing the parties' briefs and the record, we affirm.
 
 
 2
 * O'Leary was found guilty in a trial by jury on January 30-31, 1986, on all eight counts of an indictment charging him with violations of federal drug statutes. Counts I-VII were based on 21 U.S.C. Sec. 843 (b) (using a communications facility to commit or facilitate a violation of any of the federal drug laws in Title 21). Count VIII was based on 21 U.S.C. Sec. 846 (conspiracy to possess with intent to distribute, and distribution of cocaine hydrochloride). The district court sentenced O'Leary to four years of imprisonment for each of counts I-VII, to be served concurrently, and eight years of imprisonment for count VIII, to be served consecutively to the four year imprisonment terms, for a total of twelve years imprisonment. This court has previously affirmed O'Leary's conviction on the merits. United States v. James Ronald O'Leary, No. 86-5396 (6th Cir. February 4, 1987).
 
 
 3
 On October 14, 1986, during the pendency of his first appeal to this Court, O'Leary filed in the district court a motion for a new trial pursuant to Fed.R.Crim.P. 33, and a motion for an evidentiary hearing, both based on allegedly newly discovered evidence pursuant to Fed.R.Crim.P. 33. O'Leary argued that certain tape recorded conversations between himself and the government witness Julius Parker, which the government allegedly suppressed, constituted newly discovered evidence. These tape recorded conversations, O'Leary contended, contained evidence material to his defense. Had he been able to present this evidence to the jury, he further argued, an acquittal in all likelihood would have resulted. The district court denied both motions on the ground that this "newly discovered evidence" was always available to O'Leary at the offices of the Federal Bureau of Investigation, and on the ground that the evidence would not have affected the jury's verdict, since the evidence provided no additional doubt about the defendant's guilt.
 
 II
 
 4
 As this Circuit has indicated, "[m]otions for a new trial based on newly discovered evidence are disfavored, and a trial court's determination that a new trial is not warranted will not be reversed absent 'clear abuse of discretion.' " United States v. O'Dell, 805 F.2d 637, 640 (6th Cir.1986), cert. denied, 108 S.Ct. 170 (1987) (quoting United States v. Allen, 748 F.2d 334, 337 (6th Cir.1984) (per curiam)). Generally, a motion for a new trial based on newly discovered evidence must satisfy four requirements before a new trial can be granted:
 
 
 5
 (1) the new evidence was discovered after trial;
 
 
 6
 (2) the evidence could not have been discovered with due diligence;
 
 
 7
 (3) the evidence is material and not merely cumulative or impeaching; and
 
 
 8
 (4) the evidence would likely produce an acquittal.
 
 
 9
 United States v. Barlow, 693 F.2d 954, 966 (6th Cir.1982). cert. denied, 461 U.S. 945 (1983).
 
 III
 
 10
 While O'Leary argues that the tapes of the conversations were not available to him before trial, the district court found otherwise. It found the government's contention unrebutted that those tape recorded conversations were always available to O'Leary upon request. In the district court's view, O'Leary had failed to satisfy the first prong of the Barlow test. We agree.
 
 
 11
 O'Leary's case was one of a number of prosecutions involving an organization known as "The Company," of which O'Leary was a part. As a matter of policy in the prosecution of these cases, the Assistant United States Attorney made available all recorded conversations of the individual defendants to the defendant's attorneys in each case. Furthermore, the United States Attorney's Office in each case entered into an agreed order whereby all of the tape recorded conversations in the possession of the FBI were made available for inspection. All the tape recorded conversations were obtained as a result of a Court authorized monitoring order. On December 30, 1985, an Agreed Order in this case was filed with the district court, which order granted O'Leary full access to any of the monitored conversations which were intercepted involving O'Leary, prior to his trial.
 
 
 12
 In addition, subsequent to his arraignment on the indictment in this case, but before the filing of the above Agreed Order, a meeting was held including O'Leary's attorney, the Assistant United States Attorney prosecuting O'Leary's case, and an FBI agent. At this meeting, O'Leary's attorney was told by the government participants that he could listen to all of his client's tape-recorded monitored conversations, which were located at the FBI offices in Chattanooga, Tennessee. Thus, O'Leary and his attorney had full access to all of the tape-recordings of O'Leary's monitored conversations.
 
 
 13
 As the record also shows, on January 21, 1986, O'Leary's counsel filed a Motion for the Production of Exculpatory Evidence and a Motion for Copies of Recordings of Telephone Conversations. On January 27, 1986, the United States denied knowledge of the existence of any exonerating evidence. In its Answer to Defendant's Motion for Copies of Recordings of Telephone Conversations, the United States informed O'Leary's counsel that "[it] ha[d] previously agreed and informed counsel for the appellant that all telephone conversations in its possession in which James R. O'Leary is a party will be made available to counsel for the defendant to review." The United States here referred to the Agreed Order of December 30, 1985 (discussed above) which permitted counsel access to all tape recorded conversations involving O'Leary. Not only did the United States refer to the Agreed Order, but mentioned its previous indication to O'Leary's counsel in pre-trial discovery session that inspection of all intercepted or monitored conversations involving O'Leary was possible on request. As the record shows, on January 30, 1986, the United States was unaware of any exculpatory evidence in its possession, and indicated that it would provide O'Leary's counsel with any and all exculpatory evidence or information should such information or evidence ever be discovered.
 
 
 14
 Any confusion in this case may be explained by the following facts. Before O'Leary's jury trial, the Assistant United States Attorney provided O'Leary and his attorney with a cassette tape of copies of recorded conversations which would be used by the government as evidence during trial. As the United States points out, this cassette recording did not contain all of the recorded conversations which where intercepted or monitored from O'Leary in this case. Instead, this cassette tape contained only the monitored conversations which pertained to each count of the indictment presented in the government's proof during the jury trial. Assistant United States Attorney James R. Dedrick and Special Agents Nix and Ellis stated these facts in affidavits submitted to the district court. O'Leary has presented nothing which contravenes these facts. He does maintain, however, that he first learned of these other tape recorded conversations at his sentencing hearing. Yet, had he been unaware of these other tape recorded conversations up to that time, it must have been because neither he nor his attorney made an effort to determine whether such evidence existed.
 
 IV
 
 15
 On the second prong of the Barlow test, the district also found against O'Leary. The district court found that O'Leary had not demonstrated due diligence with respect to any of those tape recordings he now maintains are critical to his case. The district court also noted that in the motion for a new trial O'Leary had failed even to allege that he ever contacted the FBI regarding the existence of additional conversations not introduced at trial. O'Leary concedes this much on appeal. O'Leary argues, however, that "the defense could not possibly be required to have contacted the F.B.I. about additional tapes of which the defense had no knowledge." We think that this strains credulity, since O'Leary was one of the conversants. Presumably, O'Leary would have had some idea of how many times he spoke with Parker. Assuming that he had no knowledge of these conversations through no fault of his own, O'Leary has neither argued, nor provided evidence in the record, that the government in any way prevented him from determining what was available and material to his defense. This court notes that O'Leary's attorney is obligated to prepare as full a defense as is possible for his client. It remains uncontroverted in the record that O'Leary and his counsel had been informed by the government that they could inspect all of the tape recordings the government had in its possession in which O'Leary was one of the conversants, not just the tapes to be used as evidence at trial. Moreover, nowhere in the record do we find evidence of any intentional deception by the government as to any of the recordings. O'Leary has therefore failed to meet the second prong of the Barlow test.
 
 V
 
 16
 Assuming arguendo that O'Leary had met the first two prongs of the Barlow test, it is, in our view, impossible for him to meet either one of the last two prongs. However, as the O'Dell Court noted, the defendant should not have to meet the severe burden of the Barlow test in cases where the prosecution has suppressed evidence favorable to the accused. 805 F.2d at 641 (quoting United States v. Agurs, 427 U.S. 97, 111 (1976)). O'Dell interpreted Agurs to hold that the movant need only show that the evidence was material, "and the test of materiality depends on the nature of the evidence and the type of request made by the defense in the attempt to discover the exculpatory evidence before trial." 805 F.2d at 641.
 
 
 17
 O'Dell further recognized that Agurs had been modified by the Supreme Court's decision in United States v. Bagley, 473 U.S. 667 (1985), where the Supreme Court adopted two standards for determining the materiality of evidence withheld by the prosecution. Ibid. Bagley divided cases into two categories: (1) those involving the knowing use of perjured testimony by the prosecution; and (2) those involving no request, a general request, or a specific request for exculpatory material. In the former category, the Court continued the Agurs rule that " 'a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.' " Bagley, 473 U.S. at 678, (quoting Agurs, 427 U.S. at 103 (footnote omitted)). In the latter category, "evidence will be considered material and the conviction set aside 'only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " O'Dell, 805 F.2d at 641, (quoting Bagley, 473 U.S. at 682). Since no evidence of any false testimony exists in the record, O'Leary's situation certainly cannot fall in the first category. Indeed, there is no evidence that the government in any way suppressed any evidence, much less material evidence. Even if we assume arguendo that the government suppressed the tape-recorded conversations, and accordingly apply the "reasonable probability" standard as required by Bagley, O'Leary can not prevail.
 
 
 18
 As stated above, the allegedly newly discovered evidence consisted of tape recorded conversations between O'Leary and Julius Parker. Parker was a gambler by profession, and assisted the government in the preparation of its case against O'Leary. The prosecution rested its case against O'Leary on the theory that certain words used by the men were code words for cocaine, such as "baskets" and "sheets." O'Leary now argues that since the government's case rested solely on the testimony of Julius Parker who was testifying in order to obtain a lesser sentence, and since Parker's occupation was gambling, the combination of these two facts "definitely [places] skepticism on the verdict." We disagree. Notwithstanding O'Leary's implications to the contrary, the jury was well aware that Parker was a government witness testifying in order to get a lesser sentence, and was also well aware that Parker was a professional gambler. Furthermore, O'Leary has never been able to specify in his brief, or in his oral argument, what aspects of these "newly discovered" tape-recorded conversations would have tended to cast doubt on the prosecution's main theory that "baskets" or "sheets" meant cocaine. Moreover, we are unable to find a basis for disagreeing with the district court that there was "overwhelming evidence that the code referred to drugs...." There was thus no reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.
 
 VI
 
 19
 On a different level, O'Leary argues that the omitted evidence would have been particularly important in the impeachment of Julius Parker, even if it would have added nothing substantive to O'Leary's defense. As support for his argument, O'Leary cites United States v. Giglio, 405 U.S. 150, 154-55 (1972) in which the Supreme Court held that where the government's case depends almost entirely on testimony from a single witness, "evidence of any understanding or agreement as to a future prosecution would be relevant to [that witness's] credibility and the jury [is] entitled to know of it." In the case at bar, however, the government disclosed the nature of the agreement between itself and Parker to O'Leary at trial. Next, O'Leary cites Coleman v. Maxwell, 399 F.2d 662, 664 (6th Cir.1968), cert. denied, 393 U.S. 1058 (1969) for the principle that the government is obliged, in certain circumstances, to disclose pertinent material evidence favorable to the defense, not only relating to matters of substance, but matters relating to the credibility of government witnesses. O'Leary has failed, however, to identify precisely what in those tape recorded conversations would have added anything to the arsenal of impeachment already available to him at trial. At the very most, the additional conversations showed that Parker and O'Leary conversed at times about non-drug-related matters, including sports. In our view, this could not have provided a basis for the impeachment of Parker, or any other government witness, or have affected any other facet of the government's case.
 
 VII
 
 20
 The decision to deny a motion for an evidentiary hearing on a motion for a new trial rests within the sound discretion of the district court. O'Dell, supra at 643 (citing United States v. Hoffa, 382 F.2d 856, 866 (6th Cir.1967), cert. denied, 390 U.S. 924 (1968)). Our review of a denial of such a motion is thus limited to determining whether the district court abused its discretion. O'Dell, 805 F.2d at at 643. In Agurs, the Supreme Court stated that when "the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." 427 U.S. at 113. However, O'Leary's situation is not such a case.
 
 
 21
 While O'Leary argues that the verdict of guilty on all eight counts of federal drug statute violations is already of questionable validity, and so "additional evidence of relatively minor importance might be sufficient to create a reasonable doubt," he fails to convince us that anything in the record renders the verdict of questionable validity. Indeed, as noted above, this court, in a previous appeal, affirmed O'Leary's conviction on the merits. Moreover, nothing in the record suggests that the district court abused its discretion, as the record shows that it considered the various items submitted by the parties to the district court, including affidavits, the prior trial record, supporting motions and briefs. Accordingly, we find this argument to be without merit as well.
 
 
 22
 Nothing in the appellate record suggests that the district court abused its discretion in denying either the motion for a new trial, or for an evidentiary hearing. Thus, the decision of the district court is AFFIRMED.